**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

**DEBRA L. HARTLEY,**

    **Plaintiff,**

       **v.**

**OFFICER WILFERT,** *et al.*,

    **Defendants.**

**Civil Action No. 12-1185 (JEB)**

<u>**MEMORANDUM OPINION**</u>

On July 20, 2009, following a 225-mile trek from her home in Pennsylvania, Plaintiff

Debra Hartley arrived in Washington seeking to meet with Michelle Obama to express her

concerns about sex discrimination in law enforcement.  Standing on the sidewalk in front of the

White House and wearing a vest bearing the words "Walking to the White House," Hartley was

confronted by two uniformed Secret Service officers, Defendant Wilfert and Defendant Doe.

During this encounter, Wilfert informed Hartley that if she remained, she would be required to

provide background data, including her name, date of birth, and Social Security number, as well

as to fill out a card and submit to questions.  He cautioned her that all of this information would

be recorded and advised her to leave, rather than be added to the Secret Service list and be

"considered one of the crazies who protest in front of the White House."  Intimidated by this

admonition, Hartley abandoned her efforts to communicate to the public on the White House

sidewalk.

She subsequently brought this suit against Officers Wilfert and Doe, alleging a violation

of her First Amendment rights.  Defendants now move to dismiss, asserting that Plaintiff cannot

bring a <u>Bivens</u> action on these facts, and that even if her speech was infringed, the officers are

entitled to qualified immunity.  Because the Court finds that Hartley has stated a cognizable

<u>Bivens</u> claim involving a clearly established constitutional right of which the officers should

have been aware, it will deny Defendants' Motion to Dismiss. [1]

## I.      Background

According to the Complaint, which must be presumed true at this stage, Hartley, a former

officer with the Pocono Mountain Regional Police Department, began a 225-mile walk in July

2009 from her home in Pennsylvania to Washington "to express her concerns about sex

discrimination in law enforcement."  Compl., ¶¶ 3, 6, 7.  She wore a vest with the message

"Walking to the White House" on the front and back and sought to "engage[] others and the

press during her walk to raise awareness about her concerns."  <u>Id.</u>, ¶¶ 7, 10.  After weeks of

travel, Hartley arrived at the White House and added the words "225 miles from the Pocono

Mountains" to her vest.  <u>See id.</u>, ¶ 11.  Hartley inquired at the guard house by the west entrance

about a meeting with Michelle Obama, but was informed that there was no appointment listed.

<u>See id.</u>, ¶ 12.  She remained on the sidewalk in front of the White House with her friend,

answering tourists' questions regarding her concerns about the unfair treatment of women in law

enforcement.  <u>See id.</u>, ¶ 13.

Hartley was briefly approached by Officer Doe and an unknown male officer, who asked

her about her walk.  <u>See id.</u>, ¶ 14.  After this exchange, Officer Doe left, but returned shortly

thereafter with Officer Wilfert.  <u>See id.</u>  Wilfert asked Hartley similar questions about what she

was doing on the sidewalk and informed her that "if you want to protest, you can . . . but we have

rules . . . and we're gonna have to call it in as a protest."  <u>See id.</u>, ¶ 16.  He made it clear that if

---

[1] Although Doe has not yet been served, the Motion before the Court was filed on behalf of both officers. Additionally, Hartley's Complaint mistakenly identified Officer Wilfert as "Officer Wolfert."  The caption was subsequently revised to reflect the correct spelling of Defendant's name.  <u>See</u> ECF No. 16 (Consent Motion to Correct Caption).

she intended to remain on the sidewalk discussing her concerns, she would have to provide "background data including name, date of birth and Social Security number, fill out a card, and submit to questions." See id., ¶ 17. Additionally, he informed her that this information would be put into Secret Service records, and he advised her that "she would probably choose to leave rather than be added to the Secret Service list and be 'considered one of the crazies who protest in front of the White House.'" See id., ¶ 18.

Intimidated by Wilfert's statements, Hartley abandoned her speech on the sidewalk. See id., ¶¶ 21, 28, 31 ("[Wilfert's] statements and threats (that she had to leave or submit to detailed inquiry and registration) in fact caused Ms. Hartley to end her expression."). At the time of the events, "Plaintiff had not committed any crime. She had not acted suspiciously or interfered with Officers [Wilfert] and Doe. She had not interfered with or threatened to interfere with any Secret Service protectee, any government function, or any member of the public." Id., ¶ 26. On August 19, 2010, Hartley filed a complaint with the Secret Service regarding the officers' conduct during the incident. See id., ¶ 29. During the investigation of that complaint, Wilfert was interviewed several times and provided varying accounts of the interaction, though he ultimately stated that he had determined that Hartley posed no threat to the White House or protectees and that no White House incident report was required. See id. He "also acknowledged that he 'may have given her the indication that she had to leave the area' which was a mistake and thus he should have handled the incident 'in a different manner,' 'used better judgment,' and 'chosen words more suitable.'" See id., ¶ 30.

## II.     Legal Standard

### A.   12(b)(6)

Under Federal Rule of Civil Procedure 12(b)(6), a court must dismiss a claim for relief when the complaint "fail[s] to state a claim upon which relief can be granted."  In evaluating a motion to dismiss, the Court must "treat the complaint's factual allegations as true and must grant plaintiff the benefit of all inferences that can be derived from the facts alleged."  Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1113 (D.C. Cir. 2000) (citation and quotation marks omitted); see also Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  A court need not accept as true, however, "a legal conclusion couched as a factual allegation," nor an inference unsupported by the facts set forth in the complaint.  Trudeau v. FTC, 456 F.3d 178, 193 (D.C. Cir. 2006) (quoting Papasan v. Allain, 478 U.S. 265, 286 (1986)).  Although "detailed factual allegations" are not necessary to withstand a Rule 12(b)(6) motion, Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007), "a complaint must contain sufficient factual matter, [if] accepted as true, to state a claim to relief that is plausible on its face."  Iqbal, 556 U.S. at 678 (quotation omitted). Though a plaintiff may survive a Rule 12(b)(6) motion even if "recovery is very remote and unlikely," the facts alleged in the complaint "must be enough to raise a right to relief above the speculative level."  Twombly, 550 U.S. at 555-56 (quoting Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)).

### B.   12(b)(4) & 12(b)(5)

Defendants' Motion alternatively moves to dismiss Plaintiff's suit for insufficient service of process under Federal Rules of Civil Procedure 12(b)(4) and 12(b)(5).  See Mot. at 21-24. Subsequent to the filing of the Motion, however, Defendant Wilfert waived service.  See ECF No. 15.  In addition, the Court extended Plaintiff's time to serve Defendant Doe until

February 15, 2013.  See Minute Order of December 20, 2012.  The Court, accordingly, will limit

its analysis to Defendants' Motion under Rule 12(b)(6).

**III.   Analysis**

Defendants raise two distinct challenges to Plaintiff's claims.  First, they contend that

Hartley cannot bring an action under Bivens v. Six Unknown Named Agents of Fed. Bureau of

Narcotics, 403 U.S. 388 (1971), for the alleged conduct here.  See Mot. at 5-16.  A Bivens

remedy should not be "created," they argue, where a comprehensive statutory scheme – here, the

Privacy Act – has been established to provide relief in a given area.  See id. at 7, 9.  Second,

Defendants maintain that "[e]ven if this Court were to entertain a Bivens claim against the

individually-sued defendants, the Complaint fails to state a claim that can withstand the defense

of qualified immunity."  Id. at 16.  They contend that the officers did not violate a "clearly

established specific First Amendment right" here, and "no reasonable officer would know that a

mere request for personal identifying information would cause a former law enforcement officer

to feel the need to cease engaging in First Amendment activities after having been told that she

could continue such activity."  Id. at 19, 21.  The Court will consider each challenge separately.

A.  Availability of a *Bivens* Action

Defendants argue that the circumstances here "counsel[] against the creation of an

alternative Bivens-type remedy," where "the Privacy Act provides a comprehensive scheme for

regulating the government's gathering, maintaining, use and dissemination of personal

identifying information, including in the context of First Amendment activities."  Id. at 7, 9.

Such consideration, Defendants assert, trumps precedent from this Circuit recognizing "a Bivens

cause of action for a First Amendment claim involving demonstrations."   Id. at 7 (citing

Dellums v. Powell, 566 F.2d 167 (D.C. Cir. 1977)).  The Court must separately address three

5

issues to respond to Defendants' position.  First, the Court will inquire whether a <u>Bivens</u> action may lie for the violation of First Amendment rights of protesters.  Second, the Court must determine if the officers' alleged conduct here could constitute such a violation.  Third, the Court will assess Defendants' assertion that the Privacy Act stands as Plaintiff's sole remedial route.

      1.      <u>*Bivens* & *First Amendment Rights of Demonstrators*</u>

In <u>Dellums</u>, this Circuit held that a <u>Bivens</u>-style damages action was maintainable where demonstrators protesting the war in Vietnam were arrested on the steps of the United States Capitol in violation of their First Amendment rights.  <u>See</u> 566 F.2d at 194-96.  In recognizing the cause of action, the court reasoned:

> Basically, what is at stake here is loss of an opportunity to express to Congress one's dissatisfaction with the laws and policies of the United States.  Staged demonstrations – capable of attracting national or regional attention in the press and broadcast media – are for better or worse a major vehicle by which those who wish to express dissent can create a forum in which their views may be brought to the attention of a mass audience and, in turn, to the attention of a national legislature.  . . .  The demonstration, the picket line, and the myriad other forms of protest which abound in our society each offer peculiarly important opportunities in which speakers may at once persuade, accuse, and seek sympathy or political support, all in a manner likely to be noticed.  Loss of such an opportunity is surely not insignificant.

<u>Id.</u> at 195.  The court expressly rejected the Government's argument that providing such a cause of action would set a trap for the unwary policeman by  "subject[ing] police officers to the alleged perplexities of First Amendment law," noting that the "broad good faith immunity" available to officers exempts them from being "held to the standards of a constitutional lawyer." <u>Id.</u> at 195 n.84.

At a hearing on the current Motion, Defendants argued that the <u>Bivens</u> cause of action recognized in <u>Dellums</u> was limited to instances in which First Amendment violations were

coupled with Fourth Amendment violations.  Nothing in that decision, however, suggests that the viability of the cause of action there hinged on the presence of an additional constitutional violation.  In fact, the specific question before the court was whether there was a "cause of action under Bivens for redress of First Amendment violations," id. at 194, and the court's analysis focused on the harm that would result from the loss of an ability to express oneself, not on a loss that would derive from an improper seizure.  See id. at 195.

This Circuit's recognition of a Bivens remedy for this type of First Amendment violation in Dellums over 35 years ago is not an anomaly that might be outdated; on the contrary, its rationale has been embraced by other circuits.  See Mendocino Envtl. Ctr. v. Mendocino Cnty., 14 F.3d 457, 464 (9th Cir. 1994) (plaintiffs stated Bivens claim where complaint contained specific factual allegations that tended to show FBI agents intended to interfere with plaintiffs' First Amendment rights to demonstrate and communicate their message about the environment); Gibson v. United States, 781 F.2d 1334, 1342 (9th Cir. 1986) (allegation that "FBI agents acted with [] impermissible motive of curbing" plaintiff's protected political speech stated claim cognizable through Bivens-type action directly under First Amendment); Paton v. La Prade, 524 F.2d 862, 870 (3rd Cir. 1975) (extending Bivens remedies "to violations of first amendment rights . . . .  [I]f [plaintiff] can prove that her first amendment rights were violated by a federal government employee, such evidence would support a cause of action for damages in the federal courts"); see also Bistrian v. Levi, 696 F.3d 352, 376 n.9 (3rd Cir. 2012) (noting Supreme Court's reluctance "to extend the Bivens implied right of action to new contexts," but holding that "[o]ur Court, however, relying on Bivens, has held that 'a federal cause of action for damages may be implied directly from the [F]irst [A]mendment.'") (quoting Milhouse v. Carlson, 652 F.2d 371, 374 (3rd Cir. 1981), and citing Paton, 524 F.2d at 869-70)); Long Haul

7

Inc. v. Regents of Univ. of California, No. 09-168, 2009 WL 4546684, at *7 (N.D. Cal. Nov. 30,

2009) (permitting Bivens-First Amendment claim, but noting that plaintiffs must plead that

defendants acted with "impermissible motive of retaliating against Plaintiffs or curbing their

First Amendment activities"); Jihaad v. Carlson, 410 F. Supp. 1132, 1134 (E.D. Mich. 1976)

("[t]he rationale of Bivens may, in a proper case, be applied to violations of the first as well as

the fourth amendment").

Indeed, in Paton, the Second Circuit observed:

> Were there no cause of action for federal infringement of first
> amendment rights, an aggrieved individual could seek damages for
> violations of his first amendment rights by state officials, 42
> U.S.C. § 1983, but not by federal officials.  There is no reason to
> allow federal officials to act with impunity in this context and to
> bar state officials.  The damage to the individual's first amendment
> interests is the same regardless of the perpetrator of the violation.

524 F.2d at 870; see also Gibson, 781 F.2d at 1342 n.3 (noting that "[g]iven the availability of §

1983 relief against state agents who infringe First Amendment rights, it is hard to see why

Bivens relief should not be available to redress equivalent violations perpetrated by federal

agents") (citing McKinley v. City of Eloy, 705 F.2d 1110 (9th Cir.1983)).

Defendants nevertheless challenge whether the Bivens cause of action as recognized in

Dellums is still viable precedent, contending that "it is unclear if that decision would survive

Supreme Court scrutiny," in light of its decision in Ashcroft v. Iqbal, 556 U.S. 662 (2009).  See

Mot. at 7.  Specifically, they point to the following language in Iqbal:

> Because implied causes of action are disfavored, the Court has
> been reluctant to extend Bivens liability "to any new context or
> new category of defendants." [citations omitted]  That reluctance
> might well have disposed of respondent's First Amendment claim
> of religious discrimination.  For while we have allowed a Bivens
> action to redress a violation of the equal protection component of
> the Due Process Clause of the Fifth Amendment, [citation
> omitted], we have not found an implied damages remedy under the

> Free Exercise Clause.  Indeed, we have declined to extend <u>Bivens</u>
> to a claim sounding in the First Amendment.

<u>Id.</u> at 6 (quoting <u>Iqbal</u>, 556 U.S. at 675).  Even if Defendants are correct in predicting the Supreme Court's response to questions not yet before it, this Court cannot accept its invitation to depart from this Circuit's binding precedent.  <u>See</u> <u>Critical Mass Energy Project v. Nuclear Regulatory Comm'n</u>, 975 F.2d 871, 876 (D.C. Cir. 1992) (*en banc*) (decisions of D.C. Circuit are binding "unless and until overturned by the court *en banc* or by Higher Authority") (citation omitted); <u>Owens–Ill., Inc. v. Aetna Cas. & Sur. Co.</u>, 597 F. Supp. 1515, 1520 (D.D.C. 1984) ("The doctrine of *stare decisis* compels district courts to adhere to a decision of the Court of Appeals of their Circuit until such time as the Court of Appeals or the Supreme Court of the United States sees fit to overrule the decision.").[2]

> 2. *Hartley's Encounter with Wilfert*

Having determined that <u>Dellums</u> recognized a <u>Bivens</u> action for First Amendment violations in the context of public demonstrations, the Court must now decide whether the conditions Wilfert placed on Hartley's ability to protest – specifically, his statements to her that she would have to provide him with her background data, would be added to the Secret Service list, and would be "considered one of the crazies who protest in front of the White House," <u>see</u> Compl., ¶¶ 16-18 – rise to the level of such a violation.  In conducting such an inquiry, the Court

---

[2] While recognizing a <u>Bivens</u> remedy for such violations, however, this Circuit has nonetheless cautioned:

> That loss of an opportunity to demonstrate constitutes loss of First Amendment rights "in their most pristine and classic form" does not mean, however, that monetary recompense should be extravagant.  The award must be proportional to the loss involved insofar as it seeks to compensate intangible injuries. The jury cannot simply be set loose to work its discretion informed only by platitudes about priceless rights.

<u>Dellums</u>, 566 F.2d at 195-96.  Indeed, the court found error in the damages instructions that were given, as they "did not require the jury to focus on the loss actually sustained by the plaintiffs."  <u>Id.</u> at 196.  Having determined that "the $7,500 judgment is totally out of proportion to any harm that has been suffered," the court vacated that judgment and remanded for a redetermination of First Amendment damages.  <u>Id.</u>  As this case proceeds, the Court trusts Plaintiff will bear this point well in mind, particularly since she, unlike the <u>Dellums</u> demonstrators, was not even arrested.

will look to First Amendment decisions in the Section 1983 context that address whether certain acts of intimidation sufficiently chill the speech of demonstrators or protesters.

As discussed above, Dellums makes clear that an actual arrest resulting in demonstrators' "loss of an opportunity to demonstrate" clearly violates First Amendment rights "'in their most pristine and classic form.'"  See 566 F.2d at 195 (citation omitted).  Additionally, there is substantial caselaw in which the threat of an arrest – even in the absence of an actual arrest – is sufficient to chill speech, in violation of the First Amendment.  See World Wide Street Preachers Fellowship v. Town of Columbia, 591 F.3d 747, 752 (5th Cir. 2009) (Fifth Circuit recognized that police officer had violated First Amendment rights of group of preachers when he threatened them with arrest if they did not end their demonstration and disperse); Childs v. Dekalb Cnty., Ga., 286 F. App'x 687, 693-94 (11th Cir. 2008) (officer's suppression of protesters' speech – by instructing them not to speak to individuals on sidewalk during protest of Honey Baked Ham – violated First Amendment); Dietrich v. John Ascuaga's Nugget, 548 F.3d 892, 896-99 (9th Cir. 2008) (constitutional violation when officer removed plaintiff from public sidewalk under threat of arrest where she was collecting signatures for political organization); Cannon v. City and Cnty. of Denver, 998 F.2d 867, 871 (10th Cir. 1993) (officer's threat to protesters that they must cover their signs or be arrested violated their constitutional rights); Lefemine v. Davis, 732 F. Supp. 2d 614, 618, 624 (D.S.C. 2010) (police officer's request that abortion protester put down his signs – "if you want to stand out here on the corner, that's fine, but we cannot have these signs up because people do consider this is offensive material. . . .  I'm asking you if you will please take the signs down.  If you do not take the signs down we will have no other choice we're gonna ticket you for breach of peace" – violated protester's First Amendment rights), overruled on other grounds, Lefemine v. Wideman, --- U.S. ---, 133 S. Ct. 9 (2012).

In <u>Lewis v. McCracken</u>, 782 F. Supp. 2d 702 (S.D. Ind. 2011), a district court held that the plaintiff pastor had established a constitutional violation of his First Amendment rights where he was threatened with arrest by an officer for trespass if he did not move his staged sidewalk demonstration to another location.  <u>Id.</u> at 707-12.  The court expressly stated that the threat alone was sufficient to chill his First Amendment rights:

> We note that Plaintiff was not actually arrested for protesting on the sidewalk in front of the Casino.  He was merely threatened with arrest and, to avoid that consequence, he complied with [the officer's] demands by moving his protest across the street.  However, "a realistic threat of arrest is enough to chill First Amendment rights," creating a justiciable controversy.

Id. at 710 n.5 (quoting <u>Hodgkins ex rel. Hodgkins v. Peterson</u>, 355 F.3d 1048, 1056 (7th Cir. 2004)).

In contrast with the aforementioned plaintiffs, Hartley was not threatened with arrest here if she continued speaking.  Wilfert's words, however, sought to intimidate her and to deter her from speaking – the same effect as a threat of arrest.  In <u>Surita v. Hyde</u>, 665 F.3d 860 (7th Cir. 2011), the Seventh Circuit noted:

> The First Amendment prohibits threats of punishment designed to discourage future protected speech.  We apply an objective test: whether the alleged conduct by the defendants would likely deter a person of ordinary firmness from continuing to engage in protected activity.  Again, [the plaintiff] must show that her potential speech was at least a motivating cause of [the defendant's] threat of punishment.  . . .  Taking the facts in [the plaintiff's] favor . . . a reasonable jury could answer "yes."

<u>Id.</u> at 878-79 (citations omitted).  The question before this Court, then, is whether Wilfert's interaction with Hartley "would likely deter a person of ordinary firmness from continuing to engage in protected activity."

In so inquiring, the Court is bound by the allegations in the Complaint.  While standing on the White House sidewalk, Plaintiff alleges she was first approached by two uniformed Secret Service officers on bicycles, Doe and an unknown male officer.  <u>See</u> Compl., ¶¶ 4, 13-14.  She was asked "about why she was there, to which she provided full answers about her walk and her underlying concerns over the unfair treatment of women in law enforcement. The officers seemed interested, even asking what police department she had been in and wishing her luck, and left after a brief exchange."  <u>Id.</u>, ¶ 14.  Hartley was later approached for a second time by Doe, this time accompanied by Officer Wilfert, who proceeded to ask her a number of questions about what she was doing on the sidewalk and "ominously" informed her that "if you want to protest, you can . . . but we have rules . . . and we're gonna have to call it in as a protest."  <u>Id.</u>, ¶ 16.  He made it clear that if she intended to remain on the sidewalk discussing her concerns, she would have to give "background data including name, date of birth and Social Security number, fill out a card, and submit to questions."  <u>Id.</u>, ¶ 17.  Additionally, he informed her that this information would be put into Secret Service records and advised her that "she would probably choose to leave rather than be added to the Secret Service list and be 'considered one of the crazies who protest in front of the White House.'"  <u>Id.</u>, ¶ 18.

Hartley alleges that she abandoned her speech on the sidewalk because she was intimidated by these statements.  <u>See id.</u>, ¶¶ 21, 28, 31 ("[Wilfert's] statements and threats (that she had to leave or submit to detailed inquiry and registration) in fact caused Ms. Hartley to end her expression.").   Indeed, Wilfert himself appears to have acknowledged that he "'may have given her the indication that she had to leave the area.'"  <u>See id.</u>, ¶ 30.  Facing two uniformed Secret Service officers who had approached for a second encounter and who had cautioned her to "leave rather than be added to the Secret Service list and be 'considered one of the crazies . . . in

front of the White House,'" Plaintiff's acquiescence is hardly a manifestation of timidity.  The

context here also matters: this took place in front of the White House in an age of heightened

security awareness.  Given these circumstances, the Court finds Hartley's retreat from the

sidewalk is consistent with the actions of a person of ordinary firmness.

Additionally, while a plaintiff's actual response to a defendant's conduct is not

dispositive, it "provides some evidence of the tendency of that conduct to chill First Amendment

activity."   Constantine v. Rectors and Visitors of George Mason Univ., 411 F.3d 474, 500 (4th

Cir. 2005).  While Defendants contend that Hartley should have ignored Wilfert's intimidation

because, as a "former law enforcement officer," she should not be "intimidated by mere verbal

statements," Mot. at 13, they cite no authority for their contention that Plaintiff should be held to

a "reasonable-former-law-enforcement-officer" standard and be expected to act differently in the

face of threats from uniformed Secret Service agents than any other individual.  The Court thus

finds that Plaintiff's allegations sufficiently state a claim for violation of First Amendment rights

under Dellums.

     *3.*      *Privacy Act*

Even if Defendants' conduct here could normally give rise to a Bivens action, they claim

they hold a get-out-of-jail-free card:  the Privacy Act.  In other words, Defendants urge the Court

to disregard Dellums and deny a Bivens remedy where a comprehensive statutory scheme – here,

the Privacy Act – has been established to provide relief in a given area.  See Mot. at 7.

Defendants characterize the claim here as "one for damages for violations of the Privacy Act,"

"[e]ven though pled as a Constitutional claim," because "Plaintiff's Complaint alleges that

Officers Wilfert and Doe sought personal information about her – her name, date of birth and

Social Security number – without authorization, resulting in harm to her for which she should

receive damages."  Mot. at 11.  Plaintiff staunchly contests this characterization of her claims,

noting that "the Privacy Act has nothing to do with this case," as "Officer Wilfert was not

engaged in collecting information, he was engaged in intimidating plaintiff from exercising her

First Amendment rights."  Opp. at 3-4.  The Court agrees: Defendants' unduly technical

characterization of the conduct here would lead to the unjust result of protecting a violation of

constitutional rights simply because Defendants' intimidation included a request for Hartley's

personal information.  The conduct here strays so far afield from the compass of the Privacy Act

that it cannot be said that Congress ever contemplated the sort of claim here being covered by

that statute.

   The Privacy Act regulates the "'collection, maintenance, use, and dissemination of

information'" about individuals by federal agencies.  Doe v. Chao, 540 U.S. 614, 618 (2004)

(quoting 5 U.S.C. § 552(a)(5)).  It "authorizes civil suits by individuals . . . whose Privacy Act

rights are infringed," Sussman v. U.S. Marshals Serv., 494 F.3d 1106, 1123 (D.C. Cir. 2007),

and provides for criminal penalties against federal officials who willfully disclose a record in

violation of the Act.  5 U.S.C. § 552a(i)(1).  The Act "represents the compromise reached by

Congress between a citizen's right to correct inaccurate records and the government's need to

assemble critical information for responsible employment decisionmaking."  Dickson v. Office

of Pers. Mgmt., 828 F.2d 32, 40 (D.C. Cir. 1987).  In furtherance of those goals, the Privacy Act

"gives agencies detailed instructions for managing their records and provides for various sorts of

civil relief to individuals aggrieved by failures on the Government's part to comply with the

requirements."  Doe, 540 U.S. at 618.  Put simply, the Act "safeguards the public from

unwarranted collection, maintenance, use and dissemination of personal information contained in

agency records . . . by allowing an individual to participate in ensuring that his records are accurate and properly used." Bartel v. FAA, 725 F.2d 1403, 1407 (D.C. Cir. 1984).

Defendants go to great lengths to frame Hartley's encounter with Wilfert here as lying in this sphere, arguing that "the Privacy Act plainly constitutes a comprehensive statutory scheme for addressing the types of private information government officials may gather from individuals, and what remedies exist when private information has been gathered in violation of the Act." Mot. at 12. As support for this characterization, Defendants relate the suit here to the claims in Wilson v. Libby, 535 F.3d 697 (D.C. Cir. 2008), the celebrated leak case. See Mot. at 11. The facts here, however, are readily distinguishable.

In Wilson, the plaintiffs alleged harm from the improper disclosure of information subject to the Privacy Act's protections. Specifically, Wilson's claims stemmed from the publication of his wife's CIA employment in an article published in several newspapers; the publication was the result of a disclosure by the Deputy Secretary of State of information contained in State Department records. 535 F.3d at 707. As this Circuit observed,

> Each claim in the Wilson complaint is based on this disclosure of Privacy Act protected information. In Count One, the Wilsons allege that Joseph Wilson's First Amendment right to free speech was violated when the information was disclosed in retaliation for his speech. . . . Thus, each Constitutional claim, whether pled in terms of privacy, property, due process, or the First Amendment, is a claim alleging damages from the improper disclosure of information covered by the Privacy Act.

Id. The claims here, in contrast, have nothing to do with disclosure of information.

In arguing that Plaintiff's claims are nonetheless covered by the Act, Defendants rely on language in the statute requiring that an agency that maintains a system of records shall "maintain no record describing how any individual exercises rights guaranteed by the First Amendment unless expressly authorized by statute or by the individual about whom the record is

maintained or unless pertinent to and within the scope of an authorized law enforcement

activity . . . ."  5 U.S.C. § 552a(e)(7).  As the Seventh Circuit explained in Bassiouni v. F.B.I.,

436 F.3d 712 (7th Cir. 2006):

> [I]n enacting § 552a, Congress was motivated by a general concern
> with the potential for abuse if the Government is allowed to collect
> political dossiers about American citizens.  Second, Congress was
> concerned that overly restrictive limitations on the Government's
> ability to collect criminal intelligence would hamper legitimate law
> enforcement efforts.  Third, Congress' concern about restricting
> law enforcement was highest in areas of agency activity affecting
> the security of our Nation.

Id. at 718.

Wilfert's actions here did not involve the sort of collection of information contemplated

by the Act; instead, his words were merely a threat to intimidate Hartley from continuing in her

speech, just as "I will arrest you if you continue to protest" or "I will take a picture of you for my

book of crazy protesters" would deter a person from speaking.  As Plaintiff observes:

> That the nature of Officer Wilfert's threat was "if you want to
> protest here we'll have to put you on our list of White House
> crazies" does not make this a case about collecting information any
> more than a threat of "if you want to protest here you'll have to
> remove your clothes" would make it a case about indecent
> exposure.  Officer Wilfert was not engaged in collecting
> information, he was engaged in intimidating plaintiff from
> exercising her First Amendment rights.

Opp. at 4.

The Court thus finds that the Privacy Act does not foreclose Hartley's First Amendment

claim here.

B.  Qualified Immunity

Defendants last contend that even if this Court were to find Plaintiff's speech to be

improperly infringed, her claim would nonetheless be barred by qualified immunity.  "The

doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  Pearson v. Callahan, 555 U.S. 223, 231 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  The doctrine "gives government officials breathing room to make reasonable but mistaken judgments" and "protects 'all but the plainly incompetent or those who knowingly violate the law.'"  Ashcroft v. al-Kidd, --- U.S. ---, 131 S. Ct. 2074, 2085 (2011) (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)).

To show that a government official is not protected by qualified immunity, a plaintiff must establish that (1) the defendant's conduct violated the Constitution, and (2) the constitutional right that was violated was sufficiently established such that a reasonable official would have known the conduct violated the Constitution.  Pearson, 555 U.S. at 232.  For the reasons set forth Section III(A)(1)-(2), *supra*, the Court finds that Plaintiff has alleged a constitutional violation.  It must now determine whether that right was clearly established.  To reject an official's claim of qualified immunity, "the unlawfulness" of his action must be apparent "in the light of pre-existing law."  Atherton v. Dist. of Columbia Office of Mayor, 567 F.3d 672, 689-90 (D.C. Cir. 2009) (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)) (quotation marks omitted).

"An official enjoys protection from a lawsuit where [his] conduct is objectively reasonable in light of existing law.  Conversely, an official is not shielded where he could be expected to know that certain conduct would violate statutory or constitutional rights."  Brown v. Fogle, 819 F. Supp. 2d 23, 28-29 (D.D.C. 2011) (quoting Farmer v. Moritsugu, 163 F.3d 610, 613 (D.C. Cir. 1998) (quotation marks omitted)).  The operation of the "clearly established" standard "depends substantially upon the level of generality at which the relevant 'legal rule' is

to be identified." Anderson, 483 U.S. at 639.  While the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right, id. at 640, this does "not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." Ashcroft, 131 S.Ct. at 2083; see Reichle v. Howards, --- U.S. ---, 132 S. Ct. 2088, 2093 (2012).

Defendants seek to define the legal rule here very specifically.  See Mot. at 19-20 ("Defendants are unaware of any clearly established authority holding that the First Amendment is violated if a law enforcement officer asks a former law enforcement officer for personal, identifying information in connection with the former law enforcement officer's exercise of First Amendment activities in a sensitive place such as the White House sidewalk.").  Plaintiffs, in contrast, frame the right at a higher level of generality.  See Opp. at 7 (characterizing right in question as Hartley's "right to stand on the White House sidewalk with her message and speak with passersby" without a permit).  Just as in Section III(A)(2), *supra*, Defendants cite no authority for their cabined view that Hartley's First Amendment rights as a former law-enforcement officer differ from those of an ordinary citizen.  The constitutional right in question should be defined as an ordinary person's expressing her views while standing on the public sidewalk in front of the White House, which Defendants appear to acknowledge is a public forum.  See Reply at 13.  Such a right was clearly established in 2009.

In Childs, upon very similar facts, the Eleventh Circuit found that the defendants were not entitled to qualified immunity, pointing to "many" decisions that

> have put police officers on notice for decades that protestors
> present on public property have a First Amendment right to
> peacefully express their views, in the absence of narrowly tailored
> ordinances restricting the time, place, or manner of the speech.
> Thus, this is one of those cases where "a general constitutional rule

18

> already identified in the decisional law [applies] with obvious
> clarity to the specific conduct in question."

286 F. App'x at 693-94 (quoting <u>United States v. Lanier</u>, 520 U.S. 259, 271 (1997)); <u>see also</u>

<u>Cannon</u>, 998 F.2d at 873-76 (finding right of plaintiff protesters to picket on public sidewalk in

front of abortion clinic with signs was clearly established constitutional right at time of 1988

arrests, but ultimately remanding to determine whether defendants could nonetheless claim

immunity under "extraordinary circumstances" exception).

   Indeed, Defendants' assertion that "no reasonable officer would know that a mere request

for personal identifying information would cause a former law enforcement officer to feel the

need to cease engaging in First Amendment activities after having been told that she could

continue such activity" is belied by Wilfert's own statements.  <u>See</u> Mot. at 21.  Pursuant to the

internal investigation that was conducted, Wilfert "acknowledged that he 'may have given her

the indication that she had to leave the area' which was a mistake and thus he should have

handled the incident 'in a different manner,' 'used better judgment,' and 'chosen words more

suitable.'"  Compl., ¶ 30.

   Because Hartley has sufficiently alleged that Defendants knowingly deprived her of

clearly established constitutional rights, the Court cannot conclude at this stage of the litigation

that they are entitled to qualified immunity from suit.

**IV.   Conclusion**

   For the aforementioned reasons, the Court will deny Defendants' Motion to Dismiss.  A

separate Order consistent with this Opinion will be issued this day.

*/s/ James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date:  <u>January 24, 2013</u>